that the counties themselves should receive such fees for their own benefit.

In the year 1896 the Liquor Tax Law was passed, providing for the payment of all excise moneys to county treasurers, to be by them distributed, one-third to the state and two-thirds to the city or town from which they were received. It also provided for a percentage fee for the county treasurers "as full compensation and in full payment of all charges and expenses for collecting the taxes herein provided for and keeping the necessary reports and issuing the liquor tax certificates." Liquor Tax Law, § 14. Neither the acts of 1877 and 1880 referred to, nor the resolution of the board of supervisors providing for an exclusive salary, could prevent a subsequent Legislature from awarding to county treasurers additional compensation. That the Legislature intended by its Liquor Tax Law to award such compensation is entirely clear. Such is the plain reading of the statute. It is urged, however, that in cases of salaried treasurers it was intended that the fees should be collected by them for the benefit of their counties. The ready and conclusive answer to such an argument is the fact that in respect to excise moneys county treasurers were to perform no county duties whatever, the collection being for the state, cities, and towns exclusively. It would be somewhat extraordinary, in the absence of express words to that effect, to read into the statute a provision that collecting fees should be paid to counties upon moneys not collected by them and not collected for their benefit.

In the year 1901 the Legislature, by chapter 550, Laws of 1901, provided an entirely new system for the assessment, collection, and distribution of a uniform tax of 1 per cent. upon the capital stock of banking corporations. New duties were imposed upon county treasurers in relation to such system of taxation, and it was provided that they should receive therefor a percentage of collections for their compensation. It is contended, as to these fees, also, that they were intended to be paid for use of the counties themselves, and not for the treasurers when salaried.

Both by the Excise Law and the Bank Tax Law, duties of a novel, important, and responsible character, never before performed by county treasurers, were imposed upon such officials. It was but natural and proper that, for such additional labor, the Legislature should provide additional pay. There is no reason apparent, therefore, why the provisions of these acts, giving extra compensation to county treasurers for extra work, should not be construed according to their literal, natural, and unambiguous meaning.

The motion is denied.

---

### DAVENPORT v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. March 20, 1912.)

1. MALICIOUS PROSECUTION (§ 18*)—ACTIONS—PROBABLE CAUSE—STATEMENTS OF THIRD PARTIES.

A detective officer who procures the arrest and prosecution of a person for larceny on the sworn affidavit of a person, who claims to have personal knowledge of the guilt of the accused party, in the absence of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

any improper motive or malicious intent, has probable cause as a matter of law to believe the accused party guilty, although the affiant is himself a self-confessed thief, where there are no circumstances casting suspicion on the truth of the affidavit, and the detective has no other means of information.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 23, 24, 29–38; Dec. Dig. § 18.*]

2. MALICIOUS PROSECUTION (§ 59*)—ACTIONS—EVIDENCE—ADMISSIBILITY.

In an action for malicious prosecution, where the person instigating the prosecution acted on the affidavit of a third person, it was error to exclude evidence tending to show that such affidavit, so far as it charged other larcenies, was, upon investigation, found to be correct.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 125–137; Dec. Dig. § 59.*]

Appeal from Trial Term, Onondaga County.

Action by William E. Davenport against the New York Central & Hudson River Railroad Company. From a judgment on a verdict for plaintiff and from an order denying a motion to set aside the verdict, and for a new trial on exceptions, defendant appeals. Reversed, and new trial ordered.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

Hiscock, Doheny, Williams & Cowie, for appellant.
Frank E. Young, for respondent.

FOOTE, J. The plaintiff has recovered a verdict of $400 for malicious prosecution. He was arrested on process issued by a justice of the peace upon the complaint of one Hatfield, who was employed by defendant as a detective officer at its freightyards in the towns of De Witt and Manlius, near the city of Syracuse.

[1] It is urged by defendant in support of this appeal that on the undisputed evidence defendant's agent Hatfield, as matter of law, had probable cause for instituting the criminal prosecution against plaintiff. We think defendant is correct in this contention.

Hatfield had been employed by defendant in this freightyard for about 3½ years and at Buffalo 3 years before that. He had two assistants under him. There had been numerous thefts from the freight cars located at defendant's yards at De Witt, and it was Hatfield's business to investigate and prosecute for these thefts, if he could discover who had stolen the property. Plaintiff was a brakeman employed in this yard. One Gilmore and Beam were also brakemen employed in the same yard. Early in May, 1910, Gilmore and Beam had been arrested, charged with thefts from the freight cars in this yard, and had acknowledged their guilt and given information to Hatfield as to other brakemen in the yard who had also been in the habit of stealing from the cars, and, among others, plaintiff, Davenport. On May 23, 1910, Hatfield, with Gilmore, went before Justice of the Peace Orris R. Evans in the town of De Witt, and Gilmore there made an affidavit in reference to his knowledge of plaintiff stealing property from defendant's cars. He made a statement, and the jus-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tice took it down in writing, and Gilmore signed and swore to it as an affidavit. In this statement he said: That he had known Davenport for about four years. That about two years prior he saw Davenport get into a car loaded with merchandise in the fast freightyards of defendant in the town of Manlius, and, when he came out, he had two dozen oranges. After that he saw him coming from a car with two pieces of meat from the refrigerator car. They looked like pork loins. That about a year ago he saw him coming out of a loaded car, the seal of which had been broken, with two pairs of men's shoes and had them under his coat. About two weeks later he saw him coming from a loaded car, the seal of which had been broken, with two pairs of ladies' slippers of good quality. Eight or nine months ago he saw him stand opposite a loaded car, and had in his possession three or four pairs of men's working gloves, and he asked Gilmore if he wanted some, and Gilmore said, "No," and Davenport said, "All right." "About two weeks ago I saw him reach into a loaded car and get two or three rose bushes, and a quantity of seeds and bulbs." After this affidavit was sworn to and on the same day, Hatfield made an affidavit before the same justice, charging plaintiff with stealing the two rose bushes and a quantity of bulbs and seeds of the value of $2, being the last items referred to in Gilmore's affidavit. On these two affidavits the justice issued his warrant, plaintiff was sent for, pleaded not guilty, and was allowed to go on his own recognizance, and was afterward tried and acquitted. Hatfield had no personal acquaintance with plaintiff, and nothing appeared to indicate that either Hatfield or any one connected with defendant had any malice toward plaintiff or motive for seeking to injure him. Early in May, another brakeman, Beam, had been arrested and confessed to have stolen from defendant's cars in this same yard, and on the 6th of May he made a long affidavit reciting numerous larcenies known to him, and stated near the close of the affidavit that among the railroad men that he knew had stolen goods from the cars at De Witt yards were several conductors and brakemen, whose names were given: "George Gilmore, a brakeman named Davenport and a brakeman named Doyle." This affidavit Hatfield had in his possession. He had investigated a number of the cases, and had some of the persons arrested, and some had been convicted.

The evidence given by plaintiff upon the trial of the present case consisted of that of Hatfield to show that he was in the employ of defendant company, and his duties in that employment; that a few days before he caused plaintiff's arrest he had procured a search warrant and searched plaintiff's house, and had found certain cushions, lanterns, and torpedoes which appeared to be railroad property, but not known to him with certainty to be railroad property, and claimed by plaintiff's wife at the time the search was made to belong to parties residing at her house, or to be rightfully in their possession; next, the evidence of the justice, Evans, who produced his docket, and testified that plaintiff was arraigned and tried before him with a jury, and that the jury brought in a verdict of not guilty, and that defendant was acquitted and discharged; next, the evidence of plaintiff him-

self, to show his employment with defendant and its duration, his arrest, that he had never stolen anything from defendant's cars, that he had some rose bushes in his yard, that the property found in his house at the time the search was made was not stolen property, that he knew Gilmore, and did not know Hatfield, that he worked as a brakeman on the road, running on freight trains, and then worked as a brakeman in the yard about five years, that about May 9th he had set out with his wife in his yard some rose bushes which he had purchased from a nursery firm of Geneva; next, the deposition of plaintiff's wife, who was ill, to show the circumstances of the search of her house by Hatfield and information which she gave Hatfield at the time in respect to the several articles found, to the effect that they were not stolen property. During the cross-examination of Hatfield by defendant's counsel the facts were brought out in reference to the information which Hatfield had received from Beam and Gilmore, and that he believed these statements, and acted in good faith and without malice in causing plaintiff's arrest. The two affidavits were received in evidence on this cross-examination, and defendant's counsel went fully into the examination of this witness in behalf of defendant. Plaintiff gave no other testimony, and, after he had rested, defendant recalled the justice, Evans, who testified to the circumstances of his taking Gilmore's affidavit. This is substantially all the testimony upon the trial. Plaintiff offered no evidence as to what took place upon his trial before the justice, and it did not appear whether Gilmore was called as a witness or what other witnesses gave testimony.

For aught that appears in this record, plaintiff may have been acquitted on the ground that he was prosecuted in the wrong town, and not on the merits, as plaintiff's counsel now points out that part of this freightyard was in the town of Manlius and part in the town of De Witt, and that Hatfield testified on this trial that the yard where this car that the rose bushes were stolen from was located in the town of Manlius. In the absence of evidence of some improper motive or malicious intent, we think it should be entirely safe for a detective officer to procure the arrest and prosecution of an indivdiual in reliance upon the sworn testimony of a person who claims to have personal knowledge of the guilt of the accused party. In most cases which have come before the courts, the information which was acted upon in starting prosecutions was not in the form of an affidavit or given under oath.

There was nothing in the evidence to show that Hatfield had, or should have had, suspicion of the truth of the facts contained in Gilmore's affidavit, nor did it appear that Hatfield had other means of information at hand, or that good faith required him to seek for further information, nor is it suggested that he could have made further investigation, except to go to the plaintiff himself and ask him if he was guilty. This we do not think he was called upon to do. It is true that the two persons from whom Hatfield received his information of plaintiff's supposed guilt had themselves confessed stealing property from defendant's cars, and from this circumstance it is urged

that Hatfield should not have considered himself entitled to rely upon any information which they gave concerning others. No doubt he was called upon to bear in mind the fact that his informants them- selves were confessed thieves. The fact that they were such, how- ever, placed them in a position to have knowledge of the guilt of oth- ers, and, in the absence of any reason for doubting their story, we. think the fact that they were in a position to have knowledge of the facts entitled Hatfield to give credence to their statements, to the ex- tent of accepting them as probably correct and acting accordingly.

Public policy requires that a person having information which satis- fies him that another person has committed a crime should be free to institute a prosecution therefor, where there is no ulterior motive, without fear of subjecting himself to personal liability in damages in case the prosecution fails, and especially should this be true in the case of public officers, or persons who by their employment are charg- ed with a duty in respect to the enforcement of the criminal law. We think within the rule laid down in Kutner v. Fargo, 34 App. Div. 317, 54 N. Y. Supp. 332, Anderson v. How, 116 N. Y. 336, 22 N. E. 695, and Rawson v. Leggett, 184 N. Y. 504, 77 N. E. 662, it must be held as matter of law that on the evidence given at the trial in this case Hat- field had reasonable probable cause for instituting the criminal prose- cution against defendant.

[2] We are also of opinion that the learned trial court was in error in refusing to permit Hatfield as a witness to testify as to the investi- gation he made in reference to the information he received from Gil- more as to other larcenies in this freightyard and the result of such investigation, and that defendant's exceptions to such exclusion were well taken. The principal question in the case was as to whether Hatfield was justified in acting upon the information he received from Gilmore in reference to plaintiff's supposed guilt of the crime of petit larceny. He had at the same time received information of the guilt of other persons of similar larcenies at the same place. We must as- sume, if he had been permitted to answer these questions, it would have appeared that he investigated Gilmore's information as to these other larcenies, and found it to be correct. If so, the evidence would have been competent and persuasive in justification of his conduct in accepting and acting upon Gilmore's information as to plaintiff.

The judgment and order appealed from should be reversed and a new trial ordered, with costs to defendant to abide the event. All concur; ROBSON, J., in result.